# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 25, 2010

No. 09-50877

Lyle W. Cayce
Clerk

D. LLOYD THOMAS,

> Plaintiff–Appellant Cross-Appellee

v.

PETE GEREN,

> Defendant–Appellee Cross-Appellant

Appeals from the United States District Court
for the Western District of Texas
USDC No. 6:06-CV-248

Before JONES, Chief Judge, PRADO, Circuit Judge, and OZERDEN[*], District Judge.

PER CURIAM:[**]

Appellant D. Lloyd Thomas was the Acting Clinical Director of the Army Substance Abuse Program ("ASAP")[1] Clinic at the Darnall Army Community

---

[*] District Judge, Southern District of Mississippi, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] ASAP was previously known as the Alcohol and Drug Abuse Prevention and Control Program ("ADAPCP") and is also called the Substance Abuse Rehabilitation Department ("SARD"). For the sake of simplicity, we refer to it only as ASAP.

No. 09-50877

Hospital ("DACH") in Fort Hood, Texas. Thomas filed an EEO ("Equal Employment Opportunity") complaint, alleging, *inter alia*, retaliation for his removal as Acting Clinical Director and for his nonselection for a subsequent Acting Clinical Director opening. Now, Thomas argues that the district court erred in granting summary judgment in favor of the Secretary of the Army as to Thomas's retaliation claims, and the Secretary argues that the district court erred in denying his cross-claim. We find that the district court correctly granted summary judgment as to both of Thomas's claims and correctly denied the Secretary's cross-claim. Accordingly, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Thomas worked as a GS-180-11[1] Counseling Psychologist at the Fort Hood ASAP. Thomas has a master's degree in Divinity, Family Studies, and Counseling Psychology. At all relevant times, Thomas was licensed by the state of Texas as a Licensed Professional Counselor ("LPC"), Licensed Chemical Dependency Counselor ("LCDC"), Licensed Marriage and Family Therapist ("LMFT"), and Licensed Master Social Worker ("LMSW"). Although Thomas was licensed as an LMSW, Thomas did not have an advanced degree in social work and had acquired his license through grandfathering rather than by examination. Because Thomas had not passed Texas's licensing examination, he was able to practice as a supervised employee, but would not have been permitted to open his own practice.

Thomas assisted the former Clinical Director, Tom Williams, in filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). Thomas helped Williams research and develop his EEO complaint and was listed

---

[1] The term "GS-180-11" identifies Thomas's federal position and pay grade. "GS" stands for "General Schedule," which is "the basic pay schedule" for federal positions. 5 U.S.C. § 5104. This schedule "is divided into grades of difficulty and responsibility of work," ranging from 1 to 15; "11" was the grade for Thomas's position. *Id.* "180" identifies Thomas's position as that of a Counseling Psychologist.

No. 09-50877

as a witness in the complaint. Williams's complaint, like Thomas's, was predicated on the Army's assertion that he was not sufficiently qualified for his current position. A negotiated resolution was reached in Williams's case, and Williams retired in June 2002.

Williams recommended Thomas as his replacement, and Thomas volunteered for the position. Accordingly, in June 2002 Colonel Wayne Schirner, Deputy Commander, Clinical Services ("DCCS") of DACH, selected Thomas to be the Acting Clinical Director of the Fort Hood ASAP.

In July 2002, Dr. Wanda Kuehr, the ASAP Manager with the U.S. Army Medical Command ("MEDCOM"), made a site visit to the Fort Hood ASAP Clinic.[2] During this visit, Thomas told Kuehr that he helped Williams with his EEO complaint.

Two days later, Kuehr met with Schirner and Colonel Donald J. Kasperik, Hospital Commander. Kuehr told Schirner and Kasperik that Thomas did not meet the degree and licensure requirements to be Acting Clinical Director. Kuehr recommended that Schirner and Kasperik find a GS-13 Ph.D. licensed psychologist to be the Clinical Director of the Fort Hood ASAP. In the meantime, Kuehr recommended that Schirner and Kasperik replace Thomas with Cheryl Laws, a GS-11 Substance Abuse Counselor at the Fort Hood ASAP, because Laws was the only ASAP employee who met the heightened minimum requirements of an advanced license in social work or a license in psychology plus program management experience.

Seeking a second opinion, Kasperik asked Michael Sabolek, the Clinical Director of the ASAP at Redstone Arsenal, Alabama, to visit the Fort Hood ASAP. In August 2002, Sabolek filed his trip report, which stated that Thomas

---

[2] Army Regulation ("AR") 600-85 requires periodic reviews of ASAPs nationwide. While no one from the Fort Hood ASAP asked Kuehr to visit, it was not improper for her to visit on her own initiative.

3

should be replaced by a properly licensed and qualified candidate as soon as possible. However, the evidence indicates that Sabolek did not perform an independent review of Thomas's qualifications: Sabolek cautioned that "[i]t should be noted that the Six-Sided Folders[3] (credentialing and licensure, information) was [sic] not accessed, since an in depth review was recently conducted by Colonel [Susan] Fox from MEDCOM. That report is pending." Instead, Sabolek seemed to base his recommendation not on Thomas's insufficient qualifications but on his perceived leadership failures, including the inadequacy of regular opportunities for staff members to meet with Thomas and discuss issues that affected their work, a lack of peer review, a lack of monitoring and clinical evaluation, a lack of training, insufficient or incorrect information about licensure requirements and job security, and overall low staff morale.

Colonel Fox also reviewed the Fort Hood ASAP in August 2002. Unlike Sabolek, the evidence indicates that Fox did perform an independent review of Thomas's qualifications. Fox stated that "[a] review of the previous clinical director[4] files indicated that he did not meet the MEDCOM requirement for ASAP clinical director." Like Sabolek and Kuehr, Fox recommended that a new Clinical Director be found immediately. Also like Sabolek and Kuehr, Fox stated that "Laws should be placed as the interim director until such time as a promotion from within is made or a clinical director who meets all requirements

---

[3] Although neither party defines "six-sided folders," it seems that this term refers to personnel files that include degree, licensure, and employment histories.

[4] We note that Fox's curious language, "the previous clinical director," could refer to Williams instead of Thomas. At this point, Williams was "the previous clinical director," while Thomas was the Acting Clinical Director and had not yet been removed from this position. However, because Fox was asked to review Thomas's qualifications, and we can think of no reason for her to be reviewing Williams's qualifications post-departure, we conclude that she most likely was referring to Thomas. At the same time, we also note that our ultimate disposition does not depend on this conclusion.

No. 09-50877

can be hired." At the same time, Fox seemed to rely, at least in part, on Kuehr's findings: Fox explained that her review was "subsequent to . . . a staff assistance visit by the MEDCOM ASAP Manager and was to be based on those findings as well as the request to identify areas of compliance with [relevant] standards."

Schirner removed Thomas from the Acting Clinical Director position in August 2002. Schirner based his decision on Kuehr's assertion that Thomas was not qualified for the Acting Clinical Director position because he was deficient in degree and license requirements; and Sabolek's report, which according to Schirner confirmed that Thomas "did not have the qualifications to be the clinical director." Schirner did not mention Fox's report as a factor in his decision. In fact, Schirner stated that his decision was based on only "two reports."

In September 2002, Schirner detailed Laws to serve as Acting Clinical Director of the Fort Hood ASAP for not more than 120 days. In January 2003, DACH listed an opening for a GS-180-12 Supervisory Counseling Psychologist to serve as Acting Clinical Director of the Fort Hood ASAP for not more than one year, until a permanent GS-13 Clinical Director could be hired. The opening was posted on Resumix, the Army-wide resume program. Once an employee posts his resume on Resumix, that employee automatically is considered for any open position for which he is qualified, via a system called the Inventory Based Referral System ("IBRS"). Thomas maintained his resume on Resumix with directions to submit his resume for all GS-180 positions at Fort Hood, under the IBRS.

Schirner considered two applicants for the Acting Clinical Director position, Laws and an individual in Germany. Schirner did not consider Thomas for the position. In March 2003, Schirner selected Laws, in part because she was already essentially performing the relevant duties. She was temporarily

5

promoted from GS-11 to GS-12 and served as Acting Clinical Director until April 2004.

During this time, Thomas remained employed as a Counseling Psychologist at the Fort Hood ASAP. Not surprisingly, Thomas and Laws's relationship deteriorated. Laws appointed Whyllis Byrd, rather than Thomas, to be the backup Clinical Director when Laws was not present; filed a Violence in the Workplace complaint against Thomas, stating that she and other staff members felt intimidated by Thomas; asserted that Thomas questioned Byrd and an instructor about their qualifications, fell asleep in class, and did not turn in leave slips; and gave Thomas a "counseling statement" which expressed her concern that he failed to add a fourth "evaluation appointment" to his schedule.[5]

After Laws resigned, Pam Seidler, another Clinical Psychologist, GS-180-11 in the ASAP Clinic, served as Acting Clinical Director from April through August 2004. It is undisputed that Seidler was less qualified for the position than Thomas. In her affidavit, Seidler stated that during this time she "was never licensed as [an LMSW]," although Thomas "was licensed as [an LMSW], which made him more qualified than me." Seidler averred that "[a]t no time while I was Acting Clinical Director . . . did I possess that level of license now asserted by the [Secretary] as being necessary for qualification for the position."

Thomas submitted an EEO complaint, alleging ten claims of retaliation, including his removal as Acting Clinical Director in August 2002 and his nonselection for the subsequent Acting Clinical Director position in March 2003. After a hearing, the AJ found for the Secretary as to Thomas's claims for retaliation for removal as Acting Clinical Director and later nonselection as

---

[5] The record does not say exactly what a "counseling statement" is or what adding a "fourth evaluation appointment" means. We infer that a counseling statement is a workplace notice or reprimand, and that adding a fourth evaluation appointment is some sort of increased workload requirement which employees were required to undertake.

No. 09-50877

Acting Clinical Director. However, the AJ found that Laws was at least partially motivated by discriminatory motives for some of her actions against Thomas.[6] Because Laws was at least partially motivated by discriminatory motives, the AJ awarded attorney's fees to Thomas in the amount of $7570.28; and ordered that a notice be posted at DACH for at least sixty days informing employees that a Title VII violation had occurred.

Thomas sought review in the district court of two claims: his claim for retaliation for removal as Acting Clinical Director, and his claim for retaliation for nonselection for the subsequent Acting Clinical Director position. The Secretary cross-claimed, arguing that Thomas's appeal required across-the-board *de novo* review, so that if the district court found for the Secretary as to Thomas's retaliation claims, it should also return to the Secretary the attorney's fees that the AJ had awarded to Thomas. The district court granted summary judgment in favor of the Secretary on Thomas's claims but rejected the Secretary's counterclaim for repayment of attorney's fees. Thomas appealed, and the Secretary cross-claimed for repayment of attorney's fees.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over the parties' appeals of the district court's order under 28 U.S.C. § 1291. We review *de novo* the district court's award of summary judgment, applying the same standard as the district court. *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "A genuine issue of material fact exists when the evidence is such

---

[6] The claims based on these specific actions are not at issue in this appeal, except to the extent they affect the award of attorney's fees.

that a reasonable jury could return a verdict for the non-moving party." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. ANALYSIS

In employment discrimination cases, we apply a burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). First, the plaintiff must establish a *prima facie* case. *Id.* at 802. To establish a *prima facie* case of retaliation, "a plaintiff must show that (1) she participated in a Title VII protected activity, (2) she suffered an adverse employment action by her employer, and (3) there is a causal connection between the protected activity and the adverse action." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009) (citing *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008)). Summary judgment is appropriate if the plaintiff cannot support all three elements. *Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 769 (5th Cir. 2001).

An adverse employment action is one that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted). The standard for establishing a causal link is relatively low. *Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996). To satisfy this standard, a "plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision." *Id.*

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802–03. If the defendant succeeds in doing so, then the burden shifts back to the plaintiff to show that the defendant's reason is a pretext for retaliation. *McCoy v. City of Shreveport*, 492

F.3d 551, 557 (5th Cir. 2007). To carry this burden, the plaintiff must rebut each nonretaliatory reason articulated by the employer. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). When "the essential facts asserted by each of the parties are not in dispute," this final shift "may be expressed more appropriately as one of showing that 'but for' the protected activity, the termination would not have occurred, notwithstanding the other reasons advanced by the defendant." *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir. 1983).

## A.    The District Court Did Not Err in Granting Summary Judgment in Favor of the Secretary on Thomas's Claim for Retaliation for Removal as Acting Clinical Director

The Secretary argues that Thomas fails to establish a *prima facie* case of retaliation for removal as Acting Clinical Director, because three independent reports recommended his removal and because the undisputed facts establish that he was not qualified for the position. We disagree. However, we find that Thomas fails to demonstrate a genuine issue as to whether the Secretary's non-discriminatory motive was pretextual, because the Army's guidelines clearly showed that Thomas was not qualified for the Acting Clinical Director position. Accordingly, we find that the district court did not err in granting summary judgment on this claim.

It is undisputed that Thomas aided Williams in his EEO complaint, and that this was a protected activity. Thus, Thomas satisfies the first element of his *prima facie* case. Also, it is undisputed that Thomas was removed from the Acting Clinical Director position, and that this was an adverse employment action. Thus, Thomas also satisfies the second element of his *prima facie* case.

The parties dispute the third element: whether there is a causal connection between the protected activity and the adverse employment action. Kuehr recommended Thomas's removal two days after he told her that he participated in Williams's complaint. "'Close timing between an employee's

protected activity and an adverse action against [him] may provide the 'causal connection' required to make out a prima facie case of retaliation.'" *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)). In fact, "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Id.* (quotation omitted). Here, the two-day time lapse clearly is sufficient. Even if we were to measure the time lapse as starting when Thomas told Kuehr of his EEO activity and ending when Schirner actually removed Thomas, instead of starting when Thomas told Kuehr of his EEO activity and ending when Kuehr advised Schirner to remove Thomas, the lapse would still be only two months, significantly less than the period in *Evans*.

The Secretary argues that no causal connection exists because it is undisputed that neither Sabolek, nor Fox, nor Schirner knew of Thomas's EEO activity. The Secretary reasons that because three independent reports (filed by Kuehr, Sabolek, and Fox) recommended Thomas's removal, and because Schirner ultimately removed Thomas, Thomas would have been removed regardless of Kuehr's "tainted" report, and there is no causal connection between Thomas's EEO activity and his removal. At first, this argument seems powerful, if not dispositive. In fact, this argument carried great weight with both the AJ and the district court. However, on closer review of the record we cannot say that there is no genuine issue as to whether Schirner based his decision to remove Thomas on reports that were truly independent of Kuehr's report.

The evidence indicates that Sabolek did not perform an independent review of Thomas's qualifications; instead, he bypassed this issue, noting that "an in depth review was recently conducted by Colonel M. Fox from MEDCOM," and that this report was "pending." Sabolek based his recommendation not on Thomas's qualifications, but on his performance as Acting Clinical Director. Sabolek observed that Thomas provided inadequate regular opportunities for

staff members to discuss issues that affected their work; that Thomas provided insufficient peer review, monitoring and clinical evaluation, training, and information about licensure requirements and job security; and that staff morale was consequently very low. For these reasons, Sabolek recommended that Thomas be removed as Acting Clinical Director.

At any rate, the Secretary does not argue that Thomas was properly removed because of inadequate job performance, which would almost certainly be a factual issue not appropriate for summary disposition. Instead, the Secretary relies on the argument that Thomas was not sufficiently qualified. Because Sabolek's report does not provide an independent review of Thomas's qualifications, Schirner could not have relied on Sabolek's report as an independent source in reaching the conclusion that Thomas was not qualified to serve as Acting Clinical Director.

Next, the Secretary argues that Fox independently evaluated Thomas's credentials and found them lacking. Unlike Sabolek, the evidence indicates that Fox did perform an independent review. After reviewing Thomas's file, Fox concluded "that he did not meet the MEDCOM requirement for ASAP clinical director." Although Fox used the term "the previous clinical director" rather than referring to Thomas (who was the Acting Clinical Director at the time) by name, the most logical conclusion is that she was describing Thomas. And although she seemed to rely at least to some extent on Kuehr's findings when she noted that her review was "subsequent to . . . a staff assistance visit by [Kuehr] and was to be based on those findings," on balance it seems that Fox's actual review of Thomas's qualifications was independent of Kuehr's findings. Thus, we conclude that Fox independently evaluated Thomas's credentials and concluded that he was not qualified to serve as Acting Clinical Director.

Of course, our determination that Fox reached her conclusion independent of Kuehr's report does not in and of itself have any bearing on our decision in

11

this case. We must perform a second step: we must determine whether Schirner relied on Fox's report in reaching the decision to remove Thomas. We conclude that he did not.

Schirner explains that he relied on "two reports" when making his decision to remove Thomas. Schirner mentions Kuehr and Sabolek's reports by name. He does not mention Fox's report at all. Accordingly, it seems that he did not rely on Fox's report.[7] While Schirner believed that Sabolek's report confirmed Kuehr's assertion that Thomas "did not have the qualifications to be the clinical director," we have already explained that Sabolek did not make an independent determination on this point.

There is at least a genuine issue as to whether Schirner, in deciding to remove Thomas, relied on any independent determination other than that provided by Kuehr. Accordingly, the fact that Schirner himself did not know of Thomas's protected activity does not mean that his decision could not have been "tainted" by Kuehr's knowledge of Thomas's EEO activity. We conclude that there is at least a genuine issue as to whether Thomas's EEO activity led, at least in part, to his removal. In doing so, we keep in mind that the standard for establishing a causal link is relatively low and that a "plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision." *Long*, 88 F.3d at 305 n.4. Thus, Thomas satisfies the third element of his *prima facie* case.

The burden shifts to the Secretary to articulate a legitimate non-discriminatory reason for the adverse employment action. The Secretary's primary argument is that Thomas did not possess the requisite degree and

---

[7] We note that Fox's report was "pending" at the time Sabolek drafted his report; perhaps Fox had not yet completed her report at the time Schirner made the decision to remove Thomas.

licensure requirements for the position. This is a sufficient articulation of a legitimate non-discriminatory reason.

The burden shifts back to Thomas to demonstrate that the Secretary's non-discriminatory reason is pretextual. Thomas offers two arguments in favor of pretext. Thomas's first argument is that he *did* possess the requisite degree and licensure requirements. In making this argument, Thomas tries to distinguish between the ARs and the Army's related memoranda. Thomas's second argument is that the Army followed the degree and licensure requirements on an irregular, case-by-case basis, implying if not overtly stating that the Army used these requirements to get rid of employees that it wanted to remove and overlooked the requirements to retain employees that it wanted to keep. To support this argument, Thomas points to the subsequent appointments of Laws, and later Seidler, as Acting Clinical Director. We address each of Thomas's arguments in turn.

Thomas's first argument is that he actually was qualified for the Acting Clinical Director position. To evaluate this argument, we must review the licensure requirements for the ASAP; to do this, we must first look to the broader licensure requirements for healthcare providers in the armed services generally. The licensure requirement for the provision of healthcare within the military is established by federal statute: "A person under the jurisdiction of the Secretary of a military department may not provide health care independently as a health-care professional under this chapter unless the person has a current license to provide such care." 10 U.S.C. § 1094(a)(1). The statute includes clinical psychologists under the umbrella term "health-care professional." *Id.* § 1094(e)(2).

The military's hiring standards for treatment programs have evolved over time. When armed services substance abuse treatment programs were established in 1971, they were staffed primarily by paraprofessionals and

13

personnel who were in recovery. The Army gradually has worked to professionalize its ASAP clinics and upgrade the quality of care that they provide. In the 1980s, MEDCOM began implementing standards issued by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO" or "Joint Commission"). At that time, MEDCOM accepted LPC, Social Work, and Psychology licenses for both counselors and clinical directors.

In 1995, the Department of Defense ("DOD") issued Directive 6025.13, which stated that "[h]ealthcare practitioners shall possess and maintain a current, valid, and unrestricted license or other authorizing document . . . ." Directive 6025.13 defines "current" as "[a]ctive, not revoked, suspended, or lapsed in registration"; "valid" as a license under which "[t]he issuing authority accepts, investigates, and acts upon quality assurance information . . . regardless of the practitioner's military status or residency"; and "unrestricted" as "[n]ot subject to limitations on the scope of practice ordinarily granted all other applicants for similar specialty in the granting jurisdiction."

In addition to these generic statutory and DOD requirements, the Army has developed additional requirements. AR 40-48, issued in 1995, states that an ASAP Clinical Director "may be a GS-180 or 185 occupational series employee (at the GS-12 or -13 grade level)." Further, a Clinical Director "must also hold advanced substance abuse certification from a State or nationally accredited certifying body, or be licensed as [a social worker], psychologist, or professional counselor."

In 2000, MEDCOM requested guidance from the DOD on whether an LPC license should continue to be sufficient for a Clinical Director position.[8] In response, the DOD issued a memorandum in September 2000 which explained

---

[8] Apparently, the licensure requirements for LPCs varied significantly from state to state, and there were concerns that this patchwork might lead to inconsistent, and possibly even lax, standards for licensure.

that while LPCs were sufficiently qualified to be ASAP counselors, they "must work in an environment where they are supervised by another health care provider who possesses requisite qualifications." After receiving this DOD memorandum, MEDCOM issued its own memorandum in October 2000. This memorandum stated that "Social Workers," GS-185 personnel, "must be licensed as social workers"; and "Psychologists," GS-180 personnel, "must be licensed as psychologists or, if master's level counseling or clinical psychologists, they may be licensed as" LPCs. This memorandum also reiterated the DOD memorandum's statement that LPCs "must work under supervision." In other words, an LPC license was no longer sufficient to qualify an individual for the position of Clinical Director. In addition, in 2001 MEDCOM issued a memorandum which stated that GS-12 or GS-13 Clinical Directors "[m]ust have current competence/recent clinical experience and be licensed as a psychologist or clinical social worker."

Also in 2001, MEDCOM issued a memorandum stating that Clinical Directors "[m]ust have current competence/recent clinical experience and be licensed as a psychologist or clinical social worker IAW reference 1.j." Reference 1.j refers back to the DOD's September 2000 memorandum, which states that LPCs are qualified to be counselors but must work in a supervised environment.

Thomas argues that the relevant memoranda do not have the same force as the ARs. We disagree. Memoranda are an important part of the Army's efforts to increase the quality of its healthcare. While ARs might take some time to be created, memoranda are relatively quick and easy means to explicate licensure requirements, and to inform the community of these requirements.

Viewing all of these documents as a whole, we conclude that to be a Clinical Director, an individual must have an unrestricted license in social work or psychology. An unrestricted LPC license is no longer sufficient for a Clinical Director. It is undisputed that Thomas does not have an unrestricted license in

psychology. Thus, the question is whether he has an unrestricted license in social work. The undisputed evidence shows that he does not.

Although Thomas *is* a licensed LMSW, the Secretary argues this is insufficient because Thomas does not have the required advanced degree in social work. The Secretary asserts that Thomas's license in social work is insufficient because he did not matriculate through a social work program and because he acquired his license by grandfathering rather than by examination. While the record is somewhat light on this topic, Thomas acknowledged in his testimony at the EEOC hearing that he received his license by grandfathering and that, as a consequence, he does not have an unrestricted license in social work. In response to the question, "[I]f you were not working here at Fort Hood, could you go out in the state of Texas and practice as a licensed social worker?" Thomas stated, "With the license I have right now, I can practice in an agency or under employment as a social worker anywhere in the state. I cannot open a private practice until I pass the test for a licensed clinical social worker. I've been approved by the state to take that test. I just have to schedule it, pass it, and then I can open private practice." Thomas did not have an unrestricted license in social work. He was not qualified to serve as Acting Clinical Director of the Fort Hood ASAP.

Next, we address Thomas's argument that the subsequent appointments of Laws and Seidler to the Acting Clinical Director position create a genuine issue as to pretext, because Laws was no more qualified for the Acting Clinical Director position than Thomas, and Seidler was less qualified.

Regarding Laws, it is true that Laws and Thomas both had LMSW licenses. However, Laws, unlike Thomas, had an advanced degree in social work and was qualified to practice independently in the state of Texas. Laws had an unrestricted Social Work license as envisioned by the relevant regulations;

16

Thomas did not. Although Laws and Thomas both had LMSW licenses, Laws was qualified while Thomas was not.

As for Seidler, her affidavit provides uncontroverted evidence that she was less qualified than Thomas. While Thomas had an LMSW license (albeit not an unrestricted one), Seidler did not have an LMSW license at all.[9] However, this fact is not sufficient to establish a genuine issue as to pretext. Thomas presents no evidence that Kuehr or anyone else performed an ASAP review while Seidler was Acting Clinical Director and evaluated Seidler's qualifications, or that Schirner even knew of Seidler's qualifications and chose not to remove her despite her insufficient credentials. Based on this evidence, it does not seem that the Army maliciously targeted Thomas for removal and invidiously chose when to enforce its regulations.

Thomas fails to demonstrate a genuine factual issue as to pretext. Accordingly, we find that the district court correctly granted summary judgment in favor of the Secretary as to Thomas's claim for retaliation for removal as Acting Clinical Director of the Fort Hood ASAP.

B.   **The District Court Did Not Err in Granting Summary Judgment in Favor of the Secretary on Thomas's Claim for Retaliation for Nonselection as Acting Clinical Director**

The Secretary argues that Thomas's claim for retaliation for nonselection as Acting Clinical Director in March 2003 must fail because Thomas never actually applied for the position, and since Thomas never applied for the position, no adverse employment action occurred. In response, Thomas acknowledges that he did not *actively* apply for the position, but asserts that the Army's automated Resumix system should have submitted his application automatically. Two personnel specialists, Delia Merrell and Benjamin

---

[9] Although we accept Seidler's uncontroverted factual assertion that she did not have an LMSW license, we do not, of course, accept Seidler's legal conclusion that "Lloyd Thomas was . . . qualified" to serve as Acting Clinical Director.

17

Pendleton, provided declarations saying that Thomas was not registered in IBRS for the Acting Clinical Director position in March 2003. Thus, on the one hand we have Thomas's assertion that he instructed the automated system to submit his application for any GS-12 positions at Fort Hood; on the other hand, we have the declarations of Merrell and Pendleton, along with relevant human resources records, which show that Thomas's application was not submitted.

Even if Thomas succeeds in creating a genuine issue as to whether he applied for the position and was not selected, he fails to establish a causal relationship between this nonselection and his protected EEO activity. Thomas argues that Kuehr instructed Jennifer Loy, the Medcell specialist at Fort Huachuca Civilian Operations Center,[10] to interrupt the transfer of Thomas's information from IBRS to the Army Notification System Web Enabled Response System ("ANSWER"), thus effectively removing Thomas's name from the list of qualified applicants for the position. However, Thomas provides no admissible evidence of this assertion, such as testimony or an affidavit from Loy.[11] Instead, Thomas provides only his own inadmissible hearsay testimony of his alleged conversation with Loy, and a short email exchange that ostensibly preceded the conversation.

We will not consider Thomas's inadmissible hearsay testimony when determining whether the district court correctly granted summary judgment on this claim. *See, e.g., Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or

---

[10] The parties do not explain what a Medcell specialist is, or the relationship between a Fort Hood ASAP position and the Fort Huachuca Civilian Operations Center. We infer that Loy is a national or regional human resources employee who oversees the posting of open positions and the creation of lists of eligible applicants, before sending those lists on to the components that are actually hiring.

[11] In fact, Thomas does not even assert that Loy refused to testify or provide an affidavit.

other information excludable at trial."). While the email exchange is admissible, it says nothing about whether Loy had a conversation with Kuehr, or whether Loy even removed Thomas from the list in the first place. In the exchange, Thomas asked Loy why his "rating was changed for this announcement [of the Clinical Director position]." In response, Loy told him that she had left him a voicemail in response to his email, and she asked him to call her so she could "try to explain the reasoning to you and give you a local point of contact for [the position] to inquire further."

Assuming for the sake of argument that Thomas creates a genuine issue as to adverse employment action, Thomas still fails to establish a *prima facie* case because Thomas fails to demonstrate a causal connection between the adverse employment action and his protected activity.

**C.    The District Court Did Not Err in Concluding that the Secretary Should not Recover the Attorney's Fees Paid to Thomas**

The Secretary's counterclaim asserts that the attorney's fees paid to Thomas as a result of the AJ's ruling should be returned to the Secretary. Citing *Massingill v. Nicholson*, 496 F.3d 382 (5th Cir. 2007), the Secretary argues that because Thomas sought *de novo* review of his claims in district court, he should not be permitted to retain a benefit of the AJ's ruling.

The Secretary misinterprets *Massingill*. It is true that in that case, we explained that "[o]nce a federal-sector employee exhausts her administrative remedies, she can file two types of civil actions: a suit to enforce the final administrative disposition, in which the court examines only whether the agency has complied with the disposition, or *de novo* review of the disposition." *Id.* at 384. It is also true that we framed the issue as "whether a plaintiff, under the second prong, can seek partial *de novo* review," and that we concluded that a plaintiff cannot. *Id.*

However, in *Massingill*, when we used the phrase "partial de novo review," we were referring to a plaintiff who tried to appeal the district court's remedy while keeping intact the district court's finding of liability. *Id.* at 385. We explained that a plaintiff "'may either accept the disposition and its award, or file a civil action, trying *de novo* both liability and remedy. [A plaintiff] may not, however, seek *de novo* review of just the remedial award.'" *Id.* (quoting *Scott v. Johanns*, 409 F.3d 466, 472 (D.C. Cir. 2005)).

Unlike in *Massingill*, in this case Thomas does not seek "partial de novo review" of the AJ's decision in the sense that he is trying to maintain the AJ's finding of liability but overturn the AJ's determination of compensation. Instead, Thomas seeks review of two of his claims, while not seeking review of his other claims. The AJ awarded attorney's fees to Thomas because the AJ determined that Laws was at least partially motivated by a sense that Thomas had abused the EEO process. This determination dealt with claims that Thomas did not appeal: the claims that Thomas did appeal dealt with alleged retaliation by Kuehr, not alleged retaliation by Laws. In *Massingill*, we concluded that a plaintiff cannot seek review of compensation while preserving liability; we did *not* conclude that a plaintiff cannot seek review of one claim and its related compensation while not seeking review of another claim and its related compensation.

## IV. CONCLUSION

Thomas fails to demonstrate a genuine issue as to whether the Secretary's non-discriminatory reason for removing him from the Acting Clinical Director position was pretextual. Thus, the district court did not err in granting summary judgment in favor of the Secretary on Thomas's claim for retaliation for removal from the Acting Clinical Director position. Thomas also fails to establish a *prima facie* case for retaliation for nonselection for the subsequent Acting Clinical Director opening; thus, the district court did not err in granting

No. 09-50877

summary judgment in favor of the Secretary on Thomas's claim for retaliation for nonselection.  Finally, Thomas is not barred from seeking review of some claims while not seeking review of other claims, and the district court did not err in denying the Secretary's cross-claim for repayment of Thomas's attorney's fee award.

For these reasons, we AFFIRM.